EBBRETT v. SSA May it please the Court. Mike Posey for Mr. Ebbrett, the petitioner. This is a case, as you may have discerned from the briefs, that I got on fairly late. I substituted for Mary Alice Tyler, who was appointed U.S. District Attorney. What inferences should we draw from what you're saying? None whatsoever. I just want to let you know where I am on the case. Does this mean we shouldn't pay any attention to you? I mean, I don't know what that means. No, I'm an experienced longshore practitioner. I'm quite familiar with the law. Beautiful. Go. This is a case, as you're well aware, this case involves essentially an average weekly wage issue, and average weekly wage is the basis upon which all compensation derives under the Longshore Act. So it's very important to Mr. Ebbrett. In this case, it's essentially the case of a disappearing average weekly wage. What happened was Mr. Ebbrett got whipsawed between a — Let me figure out where we are procedurally. Is there an open issue with regard to whether the partial permanent disability determination for the 1996 period was proper? I mean, quite aside from whether it stops as of the second injury, is there a medical issue as to whether that injury was actually attributable, whether it was really a permanent injury there or is that out of the case now? Well, there's a — I don't think, Your Honor, it's necessarily all encompassing a medical issue. What it was is that the ALJ decided that there was a loss of earning capacity, and that's what — But I thought there was also a question as to whether the — at some point, MTC,  temporary and there was no permanent injury. I don't believe there's any objective medical data upon which you can see in an X-ray or an MRI or a doctor's record that would show that, aha, after the 97 injury, we have a new trauma that is readily discernible. Well, but for that 96 injury, there was a finding of permanent partial disability. Correct. Right? And that — and there's really no dispute about that. None whatsoever. I believe that's the — What happened here was that for the 97 injury, the ALJ, in his third decision, stopped any payment from MTC. He merged — For the permanent partial disability award. Correct. He merged — that's correct. He merged the permanent partial disability from the 96 injury into the 97 injury, found that there was a — So we start with the note — at least part of what we start with is this award of permanent partial disability. That's correct. And I think — For the 96. Attributable to the 96 injury. Right. And I think the average weekly wage went from $1,955 to $1,328.51. When he merged them? He merged them in the second reconsideration order. And by merging them, he essentially did away with that and found another average weekly wage for the 97 injury, which was essentially lower — slightly lower than the initial average weekly wage for the 1996 injury. So it went from $1,955 to $1,936. And even with that, the claimant would submit and the petitioner would submit that even though it's a — it's a disability, nonetheless, it is a loss of earning capacity which deserves a concurrent award. Yes. The board — okay. So it gets to the board, and the board reverses the reduction in — no, determines that there should have been a reduction in average weekly wages between the 96 and 97 injury. Well, what the board did is they reversed the holding that Mr. Everett was a six-day per week worker and determined a five-day a week worker, which reduced the multiplier. Are you quarreling with that? If there are no concurrent awards, I think — But you can't — I mean, as a matter of logic, you can't quarrel with that. I mean, because they have to be right about that in terms of how the numbers wash out. I think if the — if the orders merge, I would quarrel with that. I think if — well, I think in the reply brief I addressed that. If you look at — if you look at the totality of his earnings, only 30 weeks of which was — had he been MMI and medically — That's not the standard that's applied, right? There's this ABC standard, and he seems to qualify for determination under the A standard. Well, likely not, because the A standard requires that the worker would have worked the — substantially the whole year. In this case, Mr. Everett was only MMI 30 weeks of the 52.  What is MMI? You know, you — Maximum medically improved. Past maximum medically improved. MMI. That's fixed and stable. Different. We think we know what these things mean, but you better be careful, because you deal with them all the time, and we fortunately only deal with them every three months. But he actually worked the rest of the time. I mean, in terms of whether he actually worked for 75 percent of the time over that time period, he certainly did. He did actually work for a portion of that time, and he returned to work, I think, 6 weeks after the 96th injury. He should ordinarily have been figured out under the A standard. Technically, it probably could be determined under the A standard, but I think in fairness to the Petitioner, which I believe under the Longshore Act, which is supposed to occur, all doubts are — not exactly all doubts, but the act is to be liberally construed in favor of the injured worker. I think you'd give Mr. Everett the benefit of the doubt, and I think you should probably only compute the 30 weeks he's MMI, maximum medically improved. And under that analysis, I think I've established that, of course, there's a means by which you could consider Mr. Everett a 6-day-per-week worker. Well, let's just go back there for a minute. I'm still trying to understand exactly what the Board did on the 5-day versus 6-day. As I understand it, the Board determined that there was not substantial evidence to support the ALJ's finding that he was a 6-day worker, and that what the evidence showed was that he was really just a 5-day worker, a week worker, which resulted in the reduction of average weekly wage from 96 to 97. That's what the Board said. Yes. Now, I — Now, just assume with me for a moment. Let's assume that, you know, the Board is correct. What flows from that for your argument? What flows from that is what the initial brief of my predecessor on this case is I believe there should be concurrent awards. There should be an award from MTC to the claimant to make up the difference between his loss of average weekly wage. If his average weekly wage is reduced to whatever it is, if it's 1677, as the Board eventually found, to be made whole under the Act, Mr. Everett should receive two-thirds of the difference between the 1677 and the 1955. And I think — I gather that MTC's position is it goes back to this last employer theory. Is that right? Yes. The aggravation rule or the last employer theory. Concurrent awards are acceptable in this process. Is that right? Absolutely, they are. And how do you square that with this last responsible employer theory? I don't understand how that works. If the last employer is supposed to bite the whole bullet, how do you get concurrent awards and under what circumstances? Because it's irrefutable, Your Honor, that there's a loss of wagering capacity from the first injury. If there's a — I thought the difference was the difference between a situation in which there are successive injuries, each of which causes a compensable disability, or one injury, which is the first one that causes a compensable disability, the earlier ones having aggravated the injury but not sufficiently to cause a compensable disability. But, Your Honor, it becomes compensable at the time it's established that Mr. Everett has lost earnings as a result of the injury. So I thought the last employer situation says we're not going to apportion liability in a situation where there hasn't been a disability established at an earlier time. But when there was a disability established at an earlier time and then an additional injury, then the last employer rule essentially doesn't apply. Is that right? Well, the disability is cemented in at the time that Mr. Everett incurs a loss of wagering capacity for an unscheduled injury in the story. It doesn't matter under these facts that there was an essential physical injury, which we talked about that was — you could see on an MRI or an X-ray. That doesn't matter. What we're talking about here is loss of earning capacity, and that's how you measure disability under the Act for an unscheduled injury. So your bottom line is that in order to make this man whole, you have to add to the final award here an amount that makes it equal to the entire loss? I think that if pressed into a corner, Mr. Everett, what he would want is concurrent awards, and that would be an award from MTC to make up the difference between the 1955, which was his average weekly wage at the time of the first injury, and what ended up being his average weekly wage as held by the board, if you affirm that, at 1677.74. He is entitled to two-thirds of the difference of that. And we'll hear from somebody else. Thank you. Good morning, Your Honor. My name is Richard Slegel, and I represent Steve Adoring Services of America, and we were the employer at the time of the 1997 injury. The key point here is the one pointed out by Judge Perzan. There is a permanent partial disability award that has been established. There was an argument in the trial below that the 1996 injury was only a temporary aggravation. That argument was rejected. It's not on appeal. That's what I'm trying to figure out. Is that what you're asking? It's not on appeal. Okay. That's a final determination. It shouldn't be re-argued here. And then the question becomes, should a subsequent aggravation extinguish a prior permanent partial disability award? And you've seen no cases cited to you where that has ever happened. That's why we have concurrent awards. You'll notice that we are not coming to this Court asking you to allocate the wage loss from the 1997 injury. We acknowledge we're 100 percent responsible for the wage loss for the 1997 injury. However, that does not vacate a prior PPD award. Again, as Judge Perzan said, there's a difference when you have successive injuries with successive permanent partial disability awards. And that's where concurrent jurisdiction or concurrent awards apply. And MTULIC is not an exception to that rule. MTULIC has an exception that says Section 10A will apply if it can be applied fairly and reasonably. And it's not fair and reasonable to calculate different wage earning capacities based upon the same wages for purposes of different injuries. This Court in Anderson held that when you have successive injuries, it's the wage earning capacity at the time of the second injury becomes the average weekly wage for the wage earning capacity following the first injury becomes the average weekly wage for the second injury. And that's almost an exact quote from that case. And that's what we're asking for here. We're saying that ---- That earning capacity was $1,300 or some odd dollars. But, in fact, it turned out he earned $1,300 or some odd dollars. And that's what you end up being responsible for. Well, the reason why the board came up with 1677 is they applied Section 10A. They didn't look at wage earning capacity following the 1996 injury. And they took the 10A formula for a 5-day week worker and multiplied it. You're not quarreling with that. I do quarrel with that. I think that ---- Do you think that the concurrent award should be for the difference between 1,300 and 1,900, not the difference between 1,600 and 1,900? Yes. That's where you differ with the claimant. Yes. I think that the wage earning capacity, which is a final determination, becomes the average weekly wage for the second injury. And the concurrent award ---- Basically, you're arguing that 10A doesn't apply for one reason, and he's arguing that 10A doesn't apply for a different reason. But you both argue it doesn't apply. Yes. I argue it doesn't. Even though it is, if you looked at it literally, i.e., whether he worked for the same or another employer during substantially the whole of the year immediately preceding his injury, he did. Yes. And it says that ---- and Matulak said that Section C, 10C of the Act says that if Section 10A cannot be fairly and reasonably applied, then you should look at his actual earnings during that period of time and come up with a period that fairly and reasonably determines wage earning capacity. What period would you look at? I would look at the date of maximum medical improvement up to the date of our injury, which is 30 weeks. That's the period that the ALJ looked at in calculating wage earning capacity following the 1996 injury. So what I'm saying is that if he started out at 1,900 and went down to 1,300, that wage loss ---- But if you just look at his actual earnings for those 30 weeks, you wouldn't come up with 1,300? If you did look at the actual earnings for those 30 weeks and divide them by 30, you would actually come up with a number lower than 1,300. There was a mathematical error, but we didn't raise that issue on this appeal. So in other words, if you looked at his actual ---- So he earned, in the year prior, he earned higher earnings at the beginning but less at the end? In the year prior, what happened to cause it? Yes. In the year prior, he earned higher earnings in the beginning and less at the end. And the reason why is because he tried to go back to his usual job following the Marine Terminal's injury, which was as a stevedore, and was unable to do that. He tried to go back to working full-time and was unable to do that, and ultimately changed to the lift board, which is an easier job. And that's why he earned less, because he changed to the lift board. But the loss of the wages between a stevedore and as a lift truck driver occurred before the SSA accident, and that was the responsibility of Marine Terminals, not the responsibility of stevedoring services. There is another issue that I know counsel for the solicitor would like to argue in this case, and I object to it because it wasn't an issue that was raised in either of the petitions for review. And that's the issue of whether or not people with the same wage loss should be compensated differently depending upon how many claims they file. Basically, the director takes the position that the maximum compensation rate would apply to someone who had a single catastrophic injury, but not to somebody that had a series of minor injuries and the same wage loss. Now, that issue was not raised in either of the petitions for review. It was raised in a footnote in the director's brief. And I understand that it is the subject of an argument of another Ninth Circuit Court of Appeals case that was argued last October as pending and will no doubt be decided long before this case is ever decided. So I don't think it should be re-argued here. But if it is, I think that the outcome of that case is controlled by this Court's decision in Brady-Hamilton v. Director or the Anderson case, which basically holds that in concurrent awards, the maximum specified by Congress applies. And if I have any other time, I guess I'd reserve it for rebuttal. Thank you, counsel. Thank you. May it please the Court. I'm Joshua Gillelan, appearing on behalf of the director of the Office of Workers' Compensation Programs, the administrator of this statute. I will start off by being the third attorney to tell you that the first critical issue in this case is how the aggravation rule and the last employer rule relate to the successive injury concurrent awards regime. I think the Court is on solid ground on that. They are two different situations. And precisely as Judge Brezan described, where the first injury has already resulted in a disability, the later injury that aggravates that or the further exposure to the causative condition of an occupational disease that worsens that under any reasonable principles wipe out the award to which the worker is entitled for the disability that already existed before that worsening. The proper way to deal with that is with an award for the partial disability resulting from the earlier award and then another award concurrently with that one for the further loss of earning capacity that results from the further injury or the aggravation of the occupational disease. Yeah, thank you. How did that drop out? The review board, originally the ALJ had said that, and then he said no. And then it just the review board sort of just didn't deal with it? Is that what happened? It just revised the hourly wage and just forgot about the concurrent award at that point? Yes. They revised the average weekly wage and said that given that revision, there was no continuing loss of earning capacity resulting from the 1996 injury. Well, it's a blatant mistake. They simply looked at the wrong number. They compared the average weekly wage that they determined for the 1997 injury with what the ALJ had found to be the residual earning capacity for the 96 injury, looking at the same period, essentially, but analyzing those earnings differently, and they'd come up with this $1,329 figure. That's what the ALJ had. The board compares the $1,655 that they came up with as the Section 10 average weekly wage for the 97 injury with that and said, therefore, there's no continuing loss of earning capacity. Well, the appropriate comparison would be with the average weekly wage for the 96 injury, which was $1,955, and so there was a $300-and-some reduction. And if the board had recognized that, I hope they would have recognized the appropriateness of a continuing concurrent award. The problem was, however, that the ALJ, I guess, got scared off by his failure to understand what this relationship was between the concurrent awards regime and the aggravation rule. And in an effort to avoid having to address that, just made a redetermination a year after the hearing that, oh, there was really no evidence there was anything still wrong with the claimant as a result of the 1996 injury. Well ---- And that issue is not here. I mean, I guess this isn't your problem because you're not really involved in the details of it yet. Well, it is here, though, in that although the Marine terminals did not appeal the award, the permanent partial disability award, for the six months that the ALJ put it in effect, they are defending the proposition that there was no continuing loss of earning capacity traceable to the 96 injury after the 97 injury occurred. They tell you that the record contains no substantial evidence, no medical evidence showing that there was a continuing disability resulting from the 96 injury, even though they accepted liability for a six-month period of permanent partial disability, which is logically ---- It doesn't matter if there's a permanent partial disability. And then the guy gets better. Can they come back and say, well, he's gotten better? Absolutely. They certainly can. Even if there has been ---- Permanent doesn't mean permanent. It's not stuck in there. That's right. That's right. Even if there has been a formal award that requires them to continue paying that while they seek modification of it, they're free to come in and say circumstances have changed or the determination of lost earning capacity was ---- What they're doing here essentially by observing that in fact he did earn more, so that must be wrong? Well, yes, but they do have the support of the ALJ's finding in his second decision on reconsideration. I think the problem is there. I mean, one problem is there. When he wrote his first decision, the ALJ said, it's page 30 of the original record excerpt, page 30 of his original decision, having observed the demeanor and heard the testimony of a most credible claimant, I make the following findings. Then he says he reached his maximum medical improvement on March 17, 1997, and not only did his actual wages go down, his wage earning capacity went down even further. Claimant credibly testified before me that he was able to earn those wages only by working with extreme pain and with high dosages of narcotic medications. So even the 1329 that the ALJ found, even the earnings that the claimant did have between the two injuries were inflated by the fact that he was working beyond what he should have been working. His actual earning capacity was lower, as the ALJ there determined, than his actual wages during that period. The ALJ further said, while Marine Terminals Majestic contend that the 1996 injury was a temporary aggravation and did not result in any permanent partial disability, I disagree because I find claimant's thesis and evidence in support thereof to be most probative and persuasive. While Marine Majestic contend there's no medical evidence to support such claim, claimant submits and I agree that the totality of this closed record leads to the conclusion that his low back problems were aggravated by the 1996 injury, resulting in a demonstrated loss of wage earning capacity. That's at page 43 of his decision. Then suddenly, over a year after the hearing, in his second decision on reconsideration, and despite those evaluations of the credibility of the claimant and of the evidence before him, he says, borrowing, as Mr. Slegel has said, into his decision from Marine Terminals second motion for reconsideration, with no explanation for the disparity, he says, I now find and conclude the claimant's permanent partial disability award doesn't, I'm sorry, I'm reading from the wrong decision, here it is, neither SSA nor claimant is able to point to any evidence which establishes the claimant had a loss of wage earning capacity because of the 1996 injury at Marine Terminals. Now, these flatly contradictory findings cannot stand. And I think the board just accepted that last one and made no attempt to reconcile it with the results of the original findings, which was the continuing permanent partial disability award. The ALJ was trying to avoid a legal issue because he couldn't figure it out. Well, this is not rocket science. There is a propriety of continuing concurrent awards where there's been a loss of earning capacity, and then there's a further loss of earning capacity by a further injury down the road. What do we do then? In your view, what's the result? What should we do? What are you asking us to do?  You could simply affirm the ALJ's finding of a wage earning capacity after the 1996 injury, a permanent reduction of the wage earning capacity to 1329. Now, if you do that, that takes care of the Section 8H evaluation of the earnings in this. He backed off, as you just pointed out. I'm sorry? As you just pointed out, he essentially backed off. He did indeed. He did. He affirmed something he ultimately said wasn't so. Well, you can't affirm his saying it's not so because he's given no rationale and no explanation. The fact that he said it was so. I remand it to the ALJ to clarify his findings. I hate to say it, but it is certainly a factual matter. The structure between the board, the review board, and the ALJ is such that all fact findings have to be by the ALJ. Correct. Correct. It is the ALJ who's entitled to substantial evidence limitation on review of this decision, not the board. The fact that it's the same ALJ that you tell us can't figure this out? And who gave us 100 pages of decisions with no analysis. Yes, I'm sorry to say, we'll go back to the judge. Judge Dinardi is still working, and the case would go back to him in the ordinary course. However, with clarification from the court that the concurrent awards regime is not limited to cases where the second injury is not an aggravation of the first, or as Mr. Warrens also argues, where they're different employers of the same employer makes a difference, or whether they're occupational disease or trauma, none of that matters. You have a reduction of earning capacity, you get a permanent partial disability award. Have a further reduction of earning capacity, you get another award concurrent with that one. Once in a while we send cases back to districts and say, please assign it to another judge. Or to the immigration judge. The director would have no, I'm sorry. Or to the immigration judge, as we do it occasionally, too. You know, if you think it would help, the director would have no objection whatsoever. The other question to which Mr. Slagle has just adverted is the question of what effect that continuing permanent partial disability award has on how much the award for the later total disability is. I know the issue is not fully briefed in this case, and it was fully briefed in another case that's been argued. However. That's Stephen Army Services versus OWCP? Well, one of the many cases with that caption, yes. It's the one in which the claimant's name is Errol Price. Yeah, there's another. William Price that you've decided recently. But the Errol Price. If it wasn't raised here, why should we do anything about it? Well, it was raised in the proceedings below. The ALJ flip-flopped on it. He initially, in his first decision on reconsideration, said no. That is a limit on any particular award. And hence, even though the claimant is going to get the maximum for temporary total on the 97 injury, it's no violation of the maximum for him to continue to receive the concurrent. In your view, is something capable of being decided in the Price case that will determine an issue in this case? Yes. Yes. What is that issue? Just this question. If the Court were to hold that the Section 6B maximum limitation of about $1,000 a week now, $885 when this injury happened, is a limit on the overall compensation the claimant can receive for any given week, rather than just on any one award, then much of this would be moot, and the continuing award for the 96 injury would benefit only Stevedoring Services of America by acting somehow as a credit against their $885 a week liability. The Director thinks that's absolutely wrong, that the legislative history shows and the administrative practice shows, as is certainly implicit. He's getting $300,000 plus $800,000, essentially. Yes.  As opposed to $800,000. That's right. He's getting the $800,000 anyway because the amount that Stevedoring Services was supposed to pay was more than $800,000. Precisely correct. It lost the loss. Precisely correct. The point of that limit is not that claimants should not receive a full two-thirds of their lost earnings, but that an employer should not be faced with so catastrophic a loss for an individual injury, as would be represented by having to pay more than that $885,000 a week. There is no reason for it to be applied to the combination. Now, it's an issue that is absolutely inherent in the case. As soon as you revive what the board threw out, what the ALJ threw out in his second decision on reconsideration. It's not that there's an adverse. The only decision by the ALJ on this is that the maximum doesn't apply. Correct. When he revised his opinion, then it didn't matter anymore. And when the board approved it, it also didn't matter anymore. Precisely. So, therefore, that's why it hasn't been argued here, because it didn't matter on the set of facts we had. So, therefore, when it goes back, if it's revived, the issue gets revived, and there's no reason for us to decide it now. That's fair. As long as you recognize that it's not ruled out by the decisions below. Now, the Errol Price decision probably will resolve the issue and will govern this case. I'm on that panel. Pardon? I'm on the Price panel. I recognize that, Judge Trotter, yes. I'm given great hope by that fact. I send no messages. Your time has expired, but is there anything else you want to tell us? Yes. Thank you very much. I will be very brief to make the additional point that the Brady-Hamilton decision, the Anderson case, has been misread below in several respects. And one of those is, and this is a continuing problem in many, many cases arising under the act in this circuit, it has been misread to indicate that the residual wage earning capacity figure for the earlier injury somehow should always be the same number. Since we are looking at earnings during the same period, it should be the same number as the claimant's average weekly wage figure under Section 10A for the later injury. That's certainly not what the case says. And, in fact, implicit in the terms of the Court's remand for further consideration by the ALJ in that case was the proposition that, no, they aren't necessarily the same. There are a number of reasons that they would be different. One is inflation between the time of the first injury and the time of the second injury. If the claimant's earning capacity has been reduced from $800 to $400 a week by the first injury, but then he works for 10 years in a period of rising inflation and productivity, 10 years later he's going to be making $800 a week again. But that does not signify that there is no longer a reduction in earning capacity. If everybody's wages have doubled, his $800 earnings before the first injury would now be $1,600, but for that injury. If he's back up to $800, that does not indicate that he has recovered his earning capacity that he lost at the time of the first injury, and the employer would not get a modification. The employer at the time of that first injury could not come in and get a modification by saying, look, he's making $800 the same as he was making before our injury, therefore there's no continuing loss of earning capacity and we should have a modification to get out of this. No. Inflation adjustment is a recognized factor. Likewise, if the claimant is, for example, expending extra effort, working an extra 10 hours a week to get back up to his previous earnings, the earlier employer doesn't get the benefit of that extra work and get to say, oh, he's making what he was making before, therefore there's no continuing loss of earning capacity. These are just a couple of the reasons why the average weekly wages at the later time are not equal to the wage earning capacity for purposes of comparison with the pre-first injury average weekly wage. This is the reason why you say that SSA is wrong in asking us to use the $1,300. Precisely so. Precisely so. And this case has one of these factors. That is the fact that Mr. Everett was working beyond what he should have been. Well, the later employer doesn't get to say, yes, you were making $1,900 a week, but you really shouldn't have been doing a lot of that work that you were doing, and therefore we should only have to compensate you based on what you would have earned if you had limited yourself to the work that was medically not contraindicated. The later employer still has to pay on the basis of what he was earning, even if he shouldn't have been. However, the earlier employer can't say, look, you were making $1,900 a week again, therefore we don't owe anything for the earlier injury. Anything else? That's it. Thank you very much for your indulgence. May it please the Court, I'm Raymond Warrens representing Marine Terminals in this matter. The Court should keep in mind that this is actually a three-injury case, beginning with a 1994 back injury at SSA, at which time Mr. Everett had the herniated disc in his back, which continued to trouble him until following the 1997 injury at SSA, which his own treating physician says is the cause of his disability. In between, there was an aggravation that was temporary while working for Marine Terminals, and the treating physician ---- The AOJ found it was permanent. You didn't appeal that. The AOJ did not find that it was permanent. The AOJ's finding, and this is on page 85 of the first excerpts of record, while it is obvious that SSA disputes application of the last employer rule herein, this closed record simply does not support the allegation that Clayman's wage loss after the August 5, 1996 injury was due to any medical condition related to that injury. But he had earlier found a permanent partial disability as of March and ascribed an award, and you, as far as I know, paid the award and are not appealing that. He had earlier, yes. The appealing, as I understand it, is that there should have been a cutoff at the point of the 1997 injury. And he did, in fact, cut it off at the time of the 1997 injury. And he provides a rationale in his opinion, Judge, that he cut it off because there was no medical basis relating the loss of wage or any capacity to the 1996 injury. And the BRB affirmed that. But you're claiming, you're contending that you ---- there was early determination with regard to a permanent partial disability with maximum medical improvement in March of 1997, and you never appealed that, right? What remained, we did not. And what remained, that was from a prior decision. This judge confused it quite a bit. There were three decisions. The short-term PPD award against Marine Terminals that ended up in the last decision. It wasn't intended, it wasn't seen as short-term when it was issued. Oh, yes, it was, Judge. If you look at page 5 of his findings, and as affirmed by the BRB, there was no medical basis. You have to keep in mind for a disability to be compensable under the Longshore Act, there needs to be a medical connection between the time loss and the disability. And the medical nexus is missing. Both treating physicians ---- He did make a finding which he later reversed, which was read to us before, in which he said, of course there was a medical connection. And then later he said, well, there wasn't. He did not, he looked at, he credited the claimant's testimony in the first decision, and that was his basis for not looking at the medical nexus, or not finding the medical evidence to support it. And then in the second decision, he looked at the five doctors who had concluded that the continuing disability, right before the 1997 injury, was related to something else. Ultimately, the doctors pointed in two directions. They pointed to the 1994 SSA injury, which caused the initial disc herniation, or they pointed to the 1997 SSA injury, which was the last injury. We did not appeal the judge's short-term PPD award in the prior opinion, because, one, we had already paid it, and, two, it was not worth, that money was not very much, and we didn't see the utility of a useless appeal to the Ninth Circuit over money that perhaps the fees would exceed. This is being now ---- It's a philosophical problem. I mean, there was a finding, there was a, which supported a disability determination, which was a permanent disability determination. And as I understand the law, after that, you have to have a modification in order to say that something's changed. There was no prior, a motion for modification would take place from a prior permanent partial disability award. The concurrent cases that are cited by the other three attorneys arguing here all relate to cases where there was a prior permanent partial award, a separate prior permanent partial award in the past, and then there was a new injury. You claim, then, that he never made a permanent partial disability award. He did. He gave a permanent, a closed-term permanent partial award that he ended, and he gave a rationale for ending it, because there was no medical basis for it. There is no continuing permanent partial disability award against my client. But there was no medical basis for filing it. So we did not appeal that finding. It's just as simple as that. And, you know, the court doesn't even need to get to the issue of whether or not the Marine Terminal's injury had any disabling role, because this very court considered that in the Metropolitan Stevedores v. Crescent Wharf case last August. And in that case, the director made the same argument. In looking at that case, the court said, The director of OWCP also urges us to use diminished earning capacity as a benchmark and argues for a rule that assigns liability to the claimant's last employer that, before the need for surgery arose. The court then noted that if we're going to get into the kind of analysis that they've gotten into in this case, where they're trying to attribute the amount of disability compensation liability to a succession of injuries, it results in overly complicated litigation. And in the Price case, the court ruled that you look to the last employer at the time of the last aggravation. There is no dispute in our case that the 1997 injury aggravated this man's back. In fact, that's the opinion of his treating physician, who says that that's the cause of his disability. And that's substantial evidence for the judge's findings that the last responsible employer rule places liability. If it were true that there were a loss of earning capacity as a result of a 1990, know why? There was no loss of wage earning capacity as a result of a 1996 injury. And if you look at the numbers, the numbers support that. During the week before the 1997 injury, he earned over $2,000 and worked 52 hours a week. During the week before that, he earned or he worked 52 hours that week before the 1997 injury. He worked 56 hours a week before that. He was making over $2,000 a week by the time the 1997 injury happened. And contrary to what was represented before, his wage earning went up as we get closer to the 1997 injury, to the point where he certainly was making in excess of the average weekly wage at the time of the Marine Terminals injury in 1996. And that those are the two things you compare. He was making the average weekly wage was, I believe, 1956 for the Marine Terminals injury, and right before the 1997 injury with SSA, he was making over $2,000 a week. I would actually concur with the argument made by the claimant in his opening brief and in his other brief. The $1,600 figure is wrong? The $1,600 figure, I think, is wrong, because it averaged a period of time where he took a month off for personal reasons. He – what the Court should keep in mind throughout this time is that Mr. Everett was dealing with the cancer of his wife, and she was basically dying. Isn't there a whole protocol for how one determines these amounts? Yes, it's the Matula case, Your Honor. And the judge strictly – and the board actually strictly construed the Matula case by this circuit to say that if you work more than 75 percent of the work hours during the year before your injury, then we're going to use the strict formula in 10a, and that's what it's going to be. Matula isn't that strict. The specific holding of that case was where the only ever – Any error in doing it? I believe so. Why? I believe that the judge should have found that. Why? Because there were other factors involved. This man was dealing with his – The other factor involved was that his doctor said he was working more than he should be working. Actually, the – if he was working more than he should have been working, no doctor has attributed it to my – to my client's injury. Keeping in mind that he had a herniated disc as far back as 1994 when he was working for SSA. He worked for my client for a short period of time and had a minor aggravation. And that's been the issue from the beginning. This is not a concurrent disability case because there was no prior disability award. This is, as the judge held and the BRB affirmed, this is a last responsible employer case, and we believe that the – It would be SSA. Pardon me? That would not be your client. It's not my client. Someday it might be. And as the courts say, that's why the rule, which seems overly harsh, is used nonetheless. The rule is to avoid situations just like this where an East Coast judge who happened to come out to Seattle got confused. And he didn't apply the well-established Ninth Circuit last responsible employer law because, I believe, he didn't understand it until he finally wrote his last decision. And that's where the light went on and he realized, oh, this is the last responsible employer case. In the process of doing that, he completely reversed a fact-finding that doesn't have to do with a concurrent disability law. The judge has wide discretion. And what are we supposed to do with that? He said A one time and B the second time, and the board never – absolutely contradictory, and the board never dealt with it. Well – And it's not my concern you never appealed it, but that's – it seems to me, but that's another question. Well, the judge can base his opinion on substantial evidence, which is defined as less than a preponderance and more than a scintilla. What changes his factual finding from A to B? Why? What's the basis for that is? Well, it's clear that he cites the uncontradicted medical record, which does not attribute it. It did. I also noticed that the same words were showing up in two different places. He just copied your brief, but he didn't explain it. Well, he explained it sufficiently. Long, short cases are not a model of clarity at times. But when he refers to specific medical evidence – so the claimant's not a doctor. The claimant doesn't know why his back is hurting him before the 97 injury, whether it's from the 94 disc herniation with SSA or the injury with my client. When he ultimately has complaints of continuing pain, it becomes a medical determination. And actually, the judge is on much stronger ground to rely on the uncontradicted medical evidence in this case. Your time has expired. Thank you, Judge. Thank you. You may respond. You don't have to, but if you care to, take the opportunity. Thank you, Your Honor. Just a few brief points. We have lots of ships passing in the night in here today. Understood. Just a couple points. If there is a loss when Mr. Everett returns to work, be it a difference between 1955 and the 1328, 1955 and the 1677, or the 1955 and the 1936, whatever it is, it's a loss of earning capacity and it's deserving of compensation. And it's legally compensable under the Longshore Act. Well, I understand MTC's basic position to be that there wasn't any permanent injury from a 96 injury. So, therefore, there wasn't any loss of earning capacity at that point. And, therefore, you're just stuck with the last employer, period. That's their position, but that's not correct. The correct position should be disabilities determined under the Longshore Act by loss of wage earning capacity. And if he's established a... There also has to be a medical cause. The medical cause is established if he's established a loss of wage earning capacity and it's related to the injury under Section 28. But you're telling us that it was related to the 94 injury and other events, not to the 96 injury. Well, there is the aggravation rule which comes into play with regard to the 94 injury, and that is that if there's an aggravation, it's compensable. And there was an aggravation in the 96 injury as there was an aggravation in the 97 injury. The next point is, again, with regard to the price decision... What do you do with the judge's ultimate, complete about-face in his last opinion saying that there wasn't any causation, medical causation? I didn't try this case, Your Honor, and I can't reconcile that. But we do. The last finding. We are a repellent court. The last thing we've got is a finding by the district court, by the district court, by the ALJ, that there wasn't any medical causation. We have a complete ignoring of that by the review board, as I understand it, who just didn't deal with that. And now everybody's here. What do we do next? I think it should be reversed, and I think it should be held that there should be concurrent awards consistent with the facts of this case. Reverse his fact-finding, his last fact-finding on the causation issue. The last finding being that there was no medical causation? Yes, I would. I don't think that's correct. On the ground that there really was, or on the ground that he changed his mind and didn't explain it, or on what ground? On the grounds that there was a discernible loss of wagering capacity, and how else can you explain that? I don't think that's correct. On the ground that there was no medical causation, he seems to be saying, he seems to have said the last time that whatever happened here, it wasn't because of a permanent injury that was caused by the second, by a 96 injury. But the claimant did have to switch boards, and the claimant did return to work and performed extraordinary efforts to get his wagering capacity as high as he could. And he did that as a result of the 94 injury, I guess, or as a result of his personal circumstances or something, but not as a result of the 96 injury. Well, I suppose the fact-finder could grasp his straws and come up with any scenario and find that to be the case, but I'd be... You're saying you need to reverse that fact-finding? I believe that should be reversed, Your Honor. And the last point I would make is with regard to if there is a remand in this case, I would, it would be the claimant's position that the case should be remanded to a judge other than Judge Donardi. Judge Donardi sits in Boston, Massachusetts, and would be somewhat... He's not sued with the Ninth Circuit. And it's also inconvenient for probably him to come out here for another fact-finding case. Thank you. Thank you. Case respective is ordered and submitted. We're going to clear up everything for everybody. We'll be in recess until tomorrow morning at 9 o'clock. All rise. This part of the session stands adjourned.
judges: Trott, Paez, Berzon